IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DOROTHY MEAD,                                            CV. 07-1009-PK

                Plaintiff,                              OPINION AND ORDER

v.

ROB GORDON, AARON
ASHENFELTER and CHAD
GRAVELY,

                Defendants.

_____

PAPAK, Magistrate Judge:

      Plaintiff Dorothy Mead filed this lawsuit under 42 U.S.C. § 1983, alleging violations of

her rights under the First and Fourteenth Amendments arising out of a Washington County

Sheriffs Office Exclusion Order that restricted her access to several public buildings in

Washington County.[1]  Defendant Gordon is the Washington County Sheriff.  Defendant

_____

[1] The complaint also asserted a claim for a violation of Mead's right to due process under
the Fifth Amendment, which Mead abandoned at oral argument.   The Constitution plainly

Page 1 - OPINION AND ORDER

Ashenfelter serves as a sergeant and Defendant Gravely as a deputy in the Washington County Sheriff's Office.   The parties' cross motions for summary judgment are before the Court.  Mead seeks summary judgment on her Fourteenth Amendment procedural due process claim. Defendants seek summary judgment on all of Mead's claims.  This court has jurisdiction pursuant to  28 U.S.C. §§ 1331 and 1343.  For the reasons discussed below, defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). The substantive law governing a claim or defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.,* 454 F.3d 975, 987 (9th Cir. 2006).

In evaluating a motion for summary judgment, the district court must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence.  *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most

---

foreclosed that claim because the Fifth Amendment's due process clause only applies to the federal government and, here, the defendants are local law enforcement officials.  *See Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008).

favorable to the non-moving party.  Fed. R. Civ. P. 56;  *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  Summary judgment, of course, may not be granted where the court finds unresolved issues of material fact, even in situations where the cross motions allege that no disputed facts exist.  *Id.*

## FACTUAL BACKGROUND

Dorothy Mead, a former legal secretary, does legal work for friends and acquaintances from various political and civic groups.  As part of her work, she frequently visits the state courthouse in Washington County to review files, to pay fines for others, and to conduct legal research in the law library.  She also attends court hearings to take notes and offer moral support to others.

In 2004, Mead was arrested in Washington County for trespass in the county courthouse. The district attorney dismissed the case.  Prior to 2006, Mead had never received a Notice of Exclusion from a Washington County courthouse.

## I.    Incident That Led to Exclusion Order

On November 8, 2006, Washington County Circuit Court Judge Hernandez asked Washington County Sheriff Deputy Chad Gravely to remove Mead from his courtroom.  Mead had yelled at Judge Hernandez from the gallery several times during a hearing.  Judge Hernandez, however, did not ask that Gravely exclude Mead from the courthouse.  The transcript of the hearing indicates that, when Judge Hernandez told Mead that he was removing her from his courtroom, Gravely added that she would have to leave the building, to which Mead replied,"Oh, we've been through this once before."

Gravely followed Mead to the elevator after they left the courtroom.  From that point, the

accounts of Mead and Gravely differ widely.  Gravely testified at his deposition that, when he told Mead that he was ordering her to leave the building because she had been disruptive, she yelled obscenities at him, threatened to sue him and to get him fired and made rude hand gestures at him by raising her middle finger.  Gravely further averred that he responded to Mead in a calm voice, but warned her twice that she would be excluded from the courthouse if she continued to be disruptive.  He also stated that the scene attracted attention including that of courthouse security personnel, at least one of whom left the security post at the courthouse entrance to stand by as Gravely and Mead walked out the courthouse door.  Gravely decided to issue an exclusion order at that point.

Mead, on the other hand, averred that she went directly to the exit without argument and that she did not swear at Gravely nor did she raise her voice while they were in the courthouse. She stated that Gravely was "rude and insistent" and threatened to arrest her.  Mead admitted that she "had words" with Gravely outside the courthouse because he insisted that the sidewalk was part of the courthouse and that she had to leave.  Gravely told her she was excluded from the courthouse during that exchange.

### II.    The Exclusion Process

The records of the  Board of County Commissioners of Washington County reveal that "on-going concerns about safety and security" in county buildings and the lack of a uniform policy for removal of disruptive individuals prompted the Board's decision to adopt a policy for trespass on county-owned property.   The policy provides that individuals are subject to immediate exclusion if the person engages in 1) disorderly, boisterous, riotous or violent conduct; 2) unreasonably loud, disturbing or unnecessary noise; 3) disorderly or riotous

assemblies; 4) disruption of lawful meetings; 5) abusive or offensive language; 6) drunken or offensive conduct; or 7) "conduct that is otherwise disruptive to the efficient functioning of government affairs."

The Board bestowed authority on the County Administrator to exclude individuals from county facilities, who then delegated that authority to the Washington County Sheriff.  Sheriff Rob Gordon issued a Jail Division Temporary Division Order 2006-11, which authorized  court security deputies to exclude individuals from county property.  The order directs the sheriff's deputy to fill out a Notice of Exclusion form, have it reviewed and signed by a court security sergeant or corporal and distribute it to the person it excludes and to court personnel.  The Washington County Sheriff's Office does not provide formal training on the exclusion of individuals from its facilities.  Sheriff Gordon had no personal knowledge or participation in Mead's exclusion.

The Notice of Exclusion form includes the conduct that led to the exclusion, the duration of the exclusion and the courthouse locations it covers.  It also states, "If you wish to appeal this decision, you may file a writ of review with the Washington County Circuit Court."  Mead's Notice of Exclusion lists "interfering with court business," "unreasonable noise," and "disrupting court" as the reasons for her exclusion.  The Notice excluded Mead from county facilities that contained courtrooms, including the Old Courthouse, the Justice Services Building, the Juvenile Services Building and the Law Enforcement Center, which also houses the Washington County Jail.

Gravely testified that he made the decision to exclude Mead on his own.  Gravely also decided the buildings the exclusion order would cover and how long it would last.  He testified

that he decided the length of the exclusion based on "how the person acts toward me." He

indicated that he chose to exclude Mead for 12 months because Mead raised her middle finger at

him, cursed at him and "caus[ed] a disturbance throughout the whole courthouse, even as exiting

the building to where the entrance security staff came out and was watching the whole thing."

Gravely, however, also testified that he would have made the same decision even if Mead had

not directed her actions to him personally.

The record does not indicate when Gravely learned that Mead had a prior incident at the

courthouse.  At the time of the November 8 incident, Aaron Ashenfelter was on duty as a

corporal in the Washington County Sheriff's Office Court Security Unit.  Gravely testified that

Ashenfelter told him Mead had been excluded before.  Ashenfelter testified that he was present

when Mead was arrested at the courthouse previously.  Neither officer indicates whether

Ashenfelter told Gravely about the prior incident before Gravely decided to exclude Mead for

twelve months.

After he learned that Gravely told Mead she would be excluded, Ashenfelter obtained her

date of birth and contact information from sheriff's office records and entered them on a Notice

of Exclusion form.  Deputy Gravely completed the rest of the form and Ashenfelter reviewed it

and signed his approval "as to its form."  He testified that he did not typically question a deputy's

decision to exclude an individual and that deputies have discretion to decide the length of an

exclusion.

### III.    Court Review of Exclusion Order

Following her exclusion, Mead, appearing pro se, filed for a Writ of Review on January

19, 2007.  She testified that she never received a hearing because the judge assigned to the case

told the calendaring clerk not to put her on the calendar. She filed a memorandum of law in support of her writ on February 27, 2007. On December 21, 2007, the court sent a notice of pending dismissal. Mead averred that she never received that notice. The court entered a judgment of dismissal for lack of prosecution on February 1, 2008.

### IV.    Consequences of the Exclusion Order

The Notice of Exclusion indicates that an excluded individual cannot enter any building covered by the notice unless that person is 1) appearing in her own matter; 2) has legal authority to appear in a matter for someone else; or 3) has a prearranged, verifiable meeting with someone in the building. Mead was not a party in any criminal or civil case during the period covered by the exclusion order. Mead, however, visited the courthouse approximately once a week during that time. When Mead asked for permission to enter the courthouse, she had to disclose the reasons for her visit, including the names of the people she assisted and why it was necessary for her to review their files.

### A.    Escort Within the Courthouse

The parties dispute whether deputies were intrusive when they escorted Mead and whether they escorted her every time she visited the courthouse. Mead claims she was escorted on every visit, while defendants contend that court security sometimes allowed Mead to proceed unescorted during her courthouse visits. Mead claims the deputies interfered by looming over her "in a very threatening manner" and that their presence made it impossible for her to have a private conversation while in the courthouse. She also stated that they prevented her from talking to people in the courthouse that she knew or recognized. On the other hand, Gravely indicated that he maintained a respectful distance on the days when he escorted Mead and he

only questioned her to determine where she would be and confirm that her destination was the

proper place for the business she wanted to conduct.  He asserted such questions were necessary

because, if courthouse security found Mead in another part of the courthouse, they would know

she had gone beyond the scope of her permitted entry.

### B.    Access to Courtrooms

The Exclusion Order prevented Mead from entering any courtroom unless she was a

party or witness in the proceeding.  Mead testified that no one prevented her from giving

testimony as a witness during the time covered by the exclusion order.  Mead, however, also

testified that courthouse employees threatened her with arrest if she entered the courthouse to

attend her daughter's arraignment on a driving under the influence charge.  Security personnel

also prohibited her from attending her daughter's pre-trial release hearing.  She did, however,

attend her daughter's trial.  Two deputies entered the courtroom during the trial and noticed her

but did not remove her.

### C.    Jail Visits and Inmate Correspondence

The parties dispute whether jail personnel used the Notice of Exclusion to refuse Mead's

requests to visit inmates at the county jail.  Mead avers that, when her daughter spent nine days

in jail, the jail staff told Mead she could not visit her because Mead had been excluded from the

building.  Mead also avers that jail personnel prevented Mead from visiting her friend, Tina

Rasmussen, for the same reason.

Defendants, on the other hand, state that their jail policies and procedures–not general

exclusion orders–govern access to prisoners and that Mead could have visited inmates under

those procedures.  They further aver that their search of jail records indicates that the jail listed

Page 8 - OPINION AND ORDER

Mead as an approved visitor for her daughter and Rasmussen. In Washington County, however, it can take from five to eight days after an inmate is lodged in the jail to process the inmate and review her list of visitors. Defendants assert that it was the completion of that process–not the exclusion order–that prevented Mead from visiting her daughter. They also claim that Mead was free to visit Rasmussen.

Finally, Mead testified that Washington County blocked her mail to Rasmussen. Jail personnel, however, must record an order prohibiting an inmate from communicating with an individual in the booking and classification files for that inmate. Neither Rasmussen's file nor those of Mead's daughter contain such an order. In addition, the mail clerk at the jail indicated that she does not recall ever intercepting any mail from Mead nor was she ordered to do so. The mail clerk further indicated, that if she did intercept Mead's mail, she would do so pursuant to the guidelines governing items that individuals can send to an inmate, such as prohibitions on contraband or limits on the amount of money individuals can send to inmates. Mead did not testify that jail personnel intercepted her mail to Rasmussen due to the Notice of Exclusion.

## ANALYSIS

In 42 U.S.C. § 1983, Congress created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Castle Rock v. Gonzales*, 545 U.S. 748, 755 (2005) (internal citation omitted). Thus, a plaintiff who asserts a § 1983 claim must establish: "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)

Mead argues that the Notice of Exclusion deprived her of a First Amendment right 1) to

freely engage in speech and association within the courthouse; 2) to attend court proceedings; and 3) to visit and correspond with inmates in the county jail. She further asserts that, under the Fourteenth Amendment's procedural due process guarantee, she was entitled to a hearing by a neutral decisionmaker before the Notice of Exclusion issued. Defendants assert that Mead did not suffer a deprivation of any constitutional right and, even if their conduct violated Mead's constitutional rights, they are entitled to qualified immunity because those rights were not clearly established.

## I.      Speech and Association Within the Courthouse

Mead contends, citing *Buckley v. Valeo*, 424 U.S. 1, 64 (1976), that the Notice of Exclusion compels disclosure of her affiliations and thus infringes on her First Amendment right to group association. The exclusion, however, merely required that Mead state the names of people she wished to see in the courthouse, or the files she wished to review, and conduct her affairs in the courthouse in the presence of a deputy. Even reading the facts in the light most favorable to Mead, no evidence indicates that she had to divulge that she belonged to the same group or church as the individuals she sought to assist. I find no impairment of her right to group association.

Mead also claims that the Notice of Exclusion unlawfully burdened her First Amendment right to free speech and association because deputies who escorted her in the courthouse prevented her from talking to people she knew. Defendants presented affidavits that contradict Mead's testimony. However, whether deputies prevented Mead from conversing with others in the courthouse is material to Mead's claims only if the First Amendment protects that activity.

## A.    Non-Public Forum

The extent to which the government can regulate speech depends on the nature of the forum where that speech takes place.  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797 (1985).  Typically, a county courthouse is a non-public forum because it serves to conduct the business of the county and the state courts and is not devoted to assembly and debate nor is it open to use by the public for that purpose.  *Id.*   If the forum is non-public, the government may restrict access  if the regulation is 1) "reasonable in light of the purpose served by the forum," and 2) "viewpoint neutral."  *Id.* at 966 (citing *Cornelius*, 473 U.S. at 806).

Here, the restriction at issue only applies to Mead's visits to county buildings that contain courtrooms.  Nothing indicates that the buildings serve any purpose other than to conduct county business.  Therefore, I conclude that the county buildings are non-public fora and that the Notice of Exclusion need only be reasonable and viewpoint neutral.

## B.    Reasonableness

Although the government need not choose the least restrictive alternative when it regulates speech in a non-public forum, its regulation must fulfill a legitimate and demonstrated need.  *Id.* at 967.  The State "has a legitimate need to preserve an orderly and safe place to conduct the public's business" and to maintain "proper order and decorum in the courtroom."  *Id.* at 967-68.  Thus, in *Birhanzi v. Doe*, the court upheld an exclusion order that excluded the plaintiff because he harassed a district attorney.  No. 06-116, 2007 U.S. Dist. LEXIS 40548, at *13-14 (D. Or. May 20, 2007) (exclusion order allowed plaintiff to enter courthouse to conduct necessary judicial business); *see also Comfort v. MacLaughlin*, 473 F. Supp. 2d 1026, 1029

(C.D. Cal. 2006) (upholding restriction targeting behavior that would impede free access to the courthouse).

Here, the evidence indicates that the Board of County Commissioners adopted the exclusion policy out of ongoing concern for safety and security at county-owned buildings and the lack of a standard manner to address disruptive individuals. In addition, while Mead asserts that she waited until she was outside the courthouse to "have words" with Gravely, the parties do not dispute that the altercation attracted the attention of the security personnel posted near the door. Thus, the Notice of Exclusion appears to serve a demonstrated need to maintain order in the courthouse.

The Notice of Exclusion reasonably served the government's demonstrated need. Although one might question the necessity of a year-long exclusion when Mead's actions were not violent and her previous courthouse arrest took place two years before and charges were later dropped, the defendants did not have to choose the least restrictive means to achieve their ends. The Notice allowed Mead to visit the courthouse, so long as she stated her business there and had an escort. Indeed, Mead visited the courthouse approximately once per week during the period of her exclusion. Thus, the restriction both served the government's need for order in the courthouse while allowing Mead to continue to visit the courthouse to assist individuals. I find that was a reasonable means to accommodate both parties' interests.

### C.    Viewpoint Neutrality

A restriction is not viewpoint neutral "where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum." *Sammartano*, 303 F.3d at 971. Thus, in some cases, courts must look to the government

intent behind the restriction to determine whether it is actually "an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

Here, no evidence indicates that the Notice of Exclusion discriminated among viewpoints, was based on the subject matter of Mead's speech, or was based on her particular viewpoint. The Board's exclusion policy is viewpoint neutral on its face. The Board's rationale for that policy–to maintain safety and security in public buildings–does not evidence an intent to restrict speakers based on the content of their message. Uncontradicted evidence indicates that Mead's conduct disrupted a courtroom and distracted other security personnel. Moreover, assuming the deputies restricted Mead from conversing with her associates, they acted pursuant to the Notice of Exclusion, which limited the reasons Mead could visit the courthouse. Mead's exclusion required that deputies escort her as she proceeded with her court business. If they did prevent her from conversing with others, those actions would be justified by their need to attend to other business rather than wait while Mead held conversations in the halls.

In summary, the restrictions on Mead's ability to communicate and associate with others in the courthouse were reasonable and viewpoint neutral. I therefore conclude that the restrictions did not violate Mead's rights under the First Amendment.

## II.    Access to Court Proceedings

The parties do not dispute that the Notice of Exclusion prohibited Mead from attending her daughter's arraignment and pre-trial release hearing, and other state court proceedings in Washington County unless Mead was a party or witness. Mead contends that this exclusion violated her First Amendment right to attend public court proceedings. Defendants respond that

individuals do not possess a personal right to attend court proceedings because that right

properly applies to the press and public generally.

### A.    Pre-Trial Release Hearing Implicates the Right of Access

"[T]he Supreme Court has implicitly recognized that the public has no right of access to a

particular proceeding without first establishing that the benefits of opening the proceedings

outweigh the costs to the public." *Times Mirror Co. v. United States*, 873 F.2d 1210, 1213 (9th

Cir. 1989).  The Court has established a two-part test for determining whether a First

Amendment right of access extends to a particular kind of hearing.  *Oregonian Publishing Co. v.

United States Dist. Court*, 920 F.2d 1462, 1464 (9th Cir. 1990) (citing *Press-Enterprise Co. v.

Superior Court*, 478 U.S. 1, 8-9 (1986) (*Press-Enterprise* II)).  Courts must inquire: 1) "whether

the place and process have historically been open" to the press and general public and 2)

"whether public access plays a particularly significant positive role in the actual functioning of

the proceeding." *Seattle Times Co. v. United States Dist. Court for Western Dist.*, 845 F.2d

1513, 1517 (9th Cir. 1988).  In *Seattle Times Co.*, the Ninth Circuit applied that test and

concluded, "the press and public have a right of access to pretrial release proceedings." *Id.* at

1517.

Here, Mead was excluded from all courtroom proceedings in Washington County.  In

particular, she noted that she desired to attend her daughter's pre-trial release hearing and

arraignment but the Notice of Exclusion prohibited her from doing do.  Thus, Mead sought to

attend a proceeding that the press and public have a general right to attend.  Therefore, I must

resolve whether Mead had an individual right to attend that proceeding.

**B.      Individual Right of Access**

The Supreme Court has held that the press and general public have a presumed constitutional right of access to criminal trials. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). The Court reasoned, "Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the fact-finding process . . . [and] fosters an appearance of fairness, thereby heightening public respect for the judicial process." *Id.* at 606. "[I]n the broadest terms, public access to criminal trials permits the public to participate in and serve as a check on the judicial process – an essential component in our structure of self-government." *Id.*

While the Supreme Court has examined the First Amendment right of access to court proceedings in several contexts, it has not directly addressed the exclusion of an individual, rather than a closed proceeding or protective order that limits access to the public or press at large. *See. e.g., Press-Enterprise II*, 478 U.S. at 14 (weighing criminal defendant's right to a fair trial against right of public access to preliminary hearing); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 511-12 (1984) (*Press-Enterprise I*) (weighing privacy interests of prospective jurors against public access to voir dire); *Globe Newspaper Co.*, 457 U.S. at 608 (weighing state interest in protecting minor victims of sex crime from embarrassment against public access to trial testimony of the victim); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564, 580 (1980) (plurality opinion) (weighing accused's right to a fair trial against right of public access to criminal trial); *see also Waller v. Georgia*, 467 U.S. 39, 48 (1984) (weighing privacy interests of non-parties against accused's right to public trial).

Similarly, the Ninth Circuit has described the contours of the First Amendment right of access to court proceedings only in the context of the right of the press and public in general.

*See, e.g., Phoenix Newspapers v. United States Dist. Court,* 156 F.3d 940, 949 (1998) (district court erred when it summarily denied public access to portion of criminal trial transcripts after trial concluded); *Oregonian Publishing Co.*, 920 F.2d at 1467 (9th Cir. 1990) (district court failed to make factual finding to support conclusion that release of plea agreement transcript would endanger criminal defendant); *Seattle Times Co.*, 845 F.2d at 1517 (weighing right of access to bail proceeding against defendant's right to fair trial); *United States v. Brooklier*, 685 F.2d 1162, 1168-69 (9th Cir. 1982) (district court failed to make specific findings justifying closure of *voir dire* proceeding in criminal trial); *see also United States v. Sherlock,* 865 F.2d 1069, 1077 (9th Cir. 1989) (weighing criminal defendant's right to public trial against protection of victim witness and upholding district court decision to exclude defendant's family for duration of victim's testimony).

The Second Circuit, however, has addressed this issue and concluded that an individual can assert a right of access to court proceedings "even if he or she is the only person excluded." *Huminski v. Corsones*, 396 F.3d 53, 83 (2d Cir. 2004). The court reasoned that the Supreme Court justified the right of access to court proceedings based in part on its concern that "the individual citizen can effectively participate in and contribute to our republican system of government." *Id.* at 83 (quoting *Globe Newspaper Co.*, 457 U.S. at 604). The court also considered that the unfettered ability to exclude an individual from proceedings could undermine the principles served by the right of access. *Id.*

I agree. The First Amendment right of access to proceedings does not boost community trust in the justice system unless any member of the public — not just individuals selected by the courts themselves — "may come and bear witness to what happens beyond the courtroom door."

*Id.*; *see also Richmond Newspapers, Inc.*, 448 U.S. at 577 ("The explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could . . . be foreclosed arbitrarily); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986) (holding trial court erred in granting access to court materials to one media outlet and not others because favorable treatment "allows the government to influence the type of substantive media coverage that public events will receive").  Accordingly, I conclude that the Notice of Exclusion implicated Mead's First Amendment right of access to court proceedings.

### C.    Requirements to Withstand First Amendment Scrutiny

Having found that Mead has an individual right to access court proceedings, I must now decide whether that right may give way to countervailing interests.  The Supreme Court has articulated a test to resolve competing interests in the context of courts orders that exclude the public at large.  Under that test, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510.  The Ninth Circuit, in turn, has held that a court's decision to close a proceeding withstands First Amendment scrutiny if it 1) serves a compelling government interest, 2) there is a substantial probability that, in the absence of closure, the interest would be harmed; and 3) no alternatives to closure would adequately protect the government's compelling interest. *Oregonian Publishing Co.*, 920 F.2d at 1467.  In addition, (1) those excluded from the proceeding must be afforded a reasonable opportunity to state their objections; and (2) the reasons supporting closure must be articulated in findings. *Phoenix Newspapers,* 156 F.3d at 949.

The Supreme Court has, however, indicated that "limitations on the right of access that

Page 17 - OPINION AND ORDER

resemble 'time, place and manner' restrictions on protected speech would not be subject to such strict scrutiny." *Globe Newspapers*, 457 U.S. at 607 n.17.  The Court noted, "It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets." *Richmond Newspapers, Inc.*, 448 U.S. at 581 n.18; *id.* at 598 (Brennan, J. concurring in judgment); *id.* at 600 (Stevens, J., concurring in judgment).  The Court further explained, "a trial judge, in the interest of fair administration of justice, [may] impose reasonable limitations on access to a trial." *Id.*  The Second Circuit, in *Huminski*, also noted that a court has a legitimate interest in protecting judicial proceedings and "must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property or decorum." 396 F.3d at 86-87.[2]  Moreover, both the Ninth Circuit and the Supreme Court have indicated that "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceeding available within a reasonable time." *Sherlock,* 865 F.2d at 1076 (citing *Press Enterprise I*, 464 U.S. at 512).

I conclude that, when a court or law enforcement officer decides to impair an individual's First Amendment right of access to court proceedings, that the limitation must meet the requirements for "reasonable, time and manner" restrictions in a non-public forum.  Thus, the restriction must be reasonable and viewpoint neutral.  *Sammartano,* 303 F.3d at 966.  I have already concluded that the restriction at issue here was viewpoint neutral.  I have also decided

_____

[2] The Second Circuit did not, however, "determine the precise boundaries of constitutionally appropriate official behavior" because it concluded the restrictions on the plaintiff's right of access to court proceedings exceeded even broad boundaries. *Huminski*, 396 F.3d at 87.  The restriction barred the plaintiff from all courthouses and their grounds "indefinitely and virtually completely" and thus "there was virtually no 'tailoring' at all." *Id.* at 87-88.

that the county had demonstrated need to maintain order in the courthouse.

I have no difficulty concluding that the restriction was reasonable.  I recognize the exclusion order banned Mead from observing state court proceedings in Washington County for the period of one year.   Mead, however, had disrupted a hearing by refusing to remain quiet after repeated warnings from the judge.  Thus, her physical presence in courtroom during proceedings posed a threat of additional disruptions.  Moreover, Mead could ascertain what transpired despite her exclusion.  Mead could obtain court transcripts, newspaper reports, or accounts from others who attended.  While I recognize that these sources are not equivalent to physical presence in the courtroom, I find that they nonetheless are a reasonable substitute.  Thus, I conclude the restriction at issue here did not violate Mead's First Amendment right of access to court proceedings.

**III.    Inmate Visits and Correspondence**

Mead's claim that the Notice of Exclusion deprived her of her First Amendment right to visit and correspond with inmates without affording her due process of law fails for lack of evidence of causation.  Liability under 42 U.S.C. § 1983 lies for direct personal participation in the constitutional deprivation or by "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *See Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).  Moreover, "a municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents."  *Long*, 442 F.3d at 1185.  Instead, a plaintiff may establish municipal liability "only when execution of a government policy or custom inflicts the injury."  *Id.*

Although Mead avers that jail personnel denied her permission to correspond with or

visit inmates based on the exclusion order, she cannot attribute that conduct to the defendants.
Mead presents no evidence to indicate that Gravely, Ashenfelter or Gordon personally denied her
the right to visit or restricted her mail.  Moreover, on its face, the Notice of Exclusion says
nothing about visits or mail to inmates at the county jail.  In addition, uncontradicted evidence
indicates that the Sheriff's Office did not have a policy of refusing visitors who were subject to
an exclusion order.  Mead also has presented no evidence to explain why her mail did not reach
its intended recipient at the county jail.  Defendants presented evidence to demonstrate that any
restriction on Mead's mail would be the result of Mead's failure to follow the jail's mail
guidelines – not the exclusion order.

Reading the evidence in the light most favorable to Mead, I accept as true that a member
or members of the jail staff denied her the right to visit and returned her mail.  I find no
evidence, however, to suggest that these defendants caused any restriction on Mead's
correspondence and visits with inmates.  Therefore, defendants are entitled to summary
judgement on this claim.[3]

In summary, I conclude that Mead's First Amendment claims regarding speech and
association within the courthouse and the right to attend court proceedings fail because she has
not established a constitutional deprivation.  Her First Amendment claim regarding jail visits and
correspondence fails because she has not established that the defendants caused the restrictions
at issue.  Accordingly, her claim for a violation of procedural due process under the Fourteenth

_____

[3] Mead also alleged a violation of her Fourteenth Amendment right to equal protection
under the law.  Neither party addressed this claim in their motions for summary judgment.  At
oral argument, however, Mead's counsel indicated that this claim arose from the restrictions on
Mead's access to the jail.  Even if this claim were valid on its face, which is unlikely because
Mead has not alleged class-based animus, it fails for the same reason Mead's First Amendment
claim regarding jail access fails: she has not established that the defendants were responsible.

Page 20 - OPINION AND ORDER

Amendment fails because she has not established the defendants caused a deprivation of a liberty or property interest. *See Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) (claim for a violation of procedural due process requires: 1) deprivation of a liberty or property interest; and 2) denial of adequate procedural protections. Thus, this Court need not reach the question of whether Mead received adequate procedural protections nor does it decide whether defendants are entitled to qualified immunity. Instead, Mead's claims fail on the merits because she cannot establish that the defendants violated her constitutional rights.

## CONCLUSION

Defendants' motion for summary judgment (#25) is granted and plaintiff's motion for summary judgment (#21) is denied. The case is dismissed with prejudice. Any other pending motions are denied as moot.

IT IS SO ORDERED.

DATED this 3rd day of September, 2008.


/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge